**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HENRY L. JOHN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 12-1292** |
| | ) | **Judge Arthur J. Schwab** |
| CAROLYN W. COLVIN, ACTING | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

**I.      Recommendation**

Plaintiff Henry L. John ("John") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act

("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The matter is presently before the Court on cross-

motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure

56.  ECF Nos. 8 & 10.  It is respectfully recommended that the motion for summary judgment

filed by the Commissioner (*ECF No. 10*) be denied, and that the motion for summary judgment

filed by John (*ECF No. 8*) be denied to the extent that it requests an award of benefits but granted

to the extent that it seeks a vacation of the Commissioner's decision, and a remand for further

administrative proceedings.  It is also recommended that the Commissioner's decision be

vacated, and that the case be remanded for further consideration of John's applications for DIB

and SSI benefits.

## II.    Report

### A.    Procedural History

John protectively applied for DIB and SSI benefits on June 16, 2009, alleging that he had

become "disabled" on February 15, 2008. R. at 160, 167, 222. Pennsylvania's Bureau of

Disability Determination ("Bureau") denied the applications on October 6, 2009. R. at 15, 55-

64. John responded on November 21, 2009, by filing a timely request for an administrative

hearing. R. at 67-68. On October 5, 2010, a hearing was held before Administrative Law Judge

("ALJ") David S. Pang. R. at 25. John, who was represented by counsel, appeared and testified

in Johnstown, Pennsylvania. R. at 15, 29-42. Dothel W. Edwards, Jr. ("Edwards"), an impartial

vocational expert, also testified at the hearing. R. at 43-49. The ALJ presided over the hearing

from Baltimore, Maryland, by means of a video-conferencing apparatus. R. at 15, 25. In a

decision dated January 28, 2011, the ALJ determined that John was not "disabled" within the

meaning of the Act. R. at 12-24.

On February 11, 2011, John sought administrative review of the ALJ's decision by filing

a request for review with the Appeals Council. R. at 11. The Appeals Council denied the

request for review on August 3, 2012, thereby making the ALJ's decision the "final decision" of

the Commissioner in this case.[1] R. at 1. John commenced this action on September 7, 2012,

seeking judicial review of the Commissioner's decision. ECF Nos. 1 & 3. John and the

Commissioner filed motions for summary judgment on December 12, 2012, and January 30,

---

[1] The Court has jurisdiction to review only the Commissioner's "final decision." *Califano v. Sanders*, 430 U.S. 99, 108-109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Bacon v. Sullivan*, 969 F.2d 1517, 1519-1521 (3d Cir. 1992). The ALJ's decision became the Commissioner's "final decision" in this case when the Appeals Council denied John's request for review. *Sims v. Apfel*, 530 U.S. 103, 106-107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). The Appeals Council's decision denying the request for review is not itself subject to judicial review. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Exhibit 24F became a part of the administrative record when John presented it to the Appeals Council in support of his request for review. R. at 5, 604-608. Since the documentary evidence contained within that exhibit was never before the ALJ, it cannot be considered for the purpose of determining whether his decision denying John's applications for DIB and SSI benefits is supported by substantial evidence. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 360 (3d Cir. 2011).

2013, respectively. ECF Nos. 8 & 10. These motions are the subject of this report and

recommendation, which is being filed pursuant to 28 U.S.C. § 636(b)(1)(C).

**B.** **<u>Standard of Review</u>**

This Court's review is plenary with respect to all questions of law. *Schaudeck v.*

*Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect

to factual issues, judicial review is limited to determining whether the Commissioner's decision

is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46

(3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision

or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-

1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541,

101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's

decision is supported by substantial evidence, it cannot be set aside even if this Court "would

have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v.*

*Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically

determinable basis for an impairment that prevents him [or her] from engaging in any

'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of*

*Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777

(3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is

determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).  Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard.  *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.  In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law.  That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.  The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four corners of the ALJ's decision.  *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

### C.   The ALJ's Decision

In his decision, the ALJ determined that John had not engaged in substantial gainful activity subsequent to his alleged onset date.  R. at 17.  John was found to be suffering from

degenerative disc disease of the knee, sleep apnea, fibromyalgia, depression and obesity.  R. at

17.  These impairments were deemed to be "severe" under the Commissioner's regulations.  R. at

17; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).  The ALJ

concluded that John's impairments did not meet or medically equal an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1.  R. at 17-18.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed John's

"residual functional capacity"[2] as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) and 416.967(a) except that such work must never call for climbing
> ladders, ropes, or scaffolds; no more than occasionally require climbing ramps or
> stairs, stooping, kneeling, crouching, or crawling; never require overhead pushing,
> pulling, or reaching with the left upper extremity; only frequently require
> handling or fingering objects with the left upper extremity; avoid all exposure to
> unprotected heights and use or [sic] moving machinery; allow for a sit stand [sic]
> option at the work station; and allow for the use of a cane with the dominant
> upper extremity for prolonged ambulation.  The claimant has the ability to
> understand, remember and carry out simple instructions; make judgments on
> simple work related decisions; interact appropriately with supervisors and co-
> workers in routine work settings; and respond to usual work situations and
> changes in a routine work setting.

R. at 19.  John had "past relevant work"[3] experience as a housekeeper/cleaner, janitor and

general merchandise salesman.  R. at 44, 227, 256.  Edwards classified those positions as

"unskilled"[4] and "semi-skilled"[5] jobs at the "light"[6] and "medium"[7] levels of exertion.  R. at 44.

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments."  *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a).  The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process.  20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it.  20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).  The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity."  20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[4] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, [the Commissioner]

Since John was deemed to be capable of performing only "sedentary"[8] work, it was determined that he could not return to his past relevant work.  R. at 22.

John was born on December 15, 1964, making him forty-three years old on his alleged onset date and forty-six years old on the date of the ALJ's decision.  R. at 22, 32.  He was classified as a "younger person" under the Commissioner's regulations.[9]  20 C.F.R. §§ 404.1563(c), 416.963(c).  He had a high school education and an ability to communicate in English.  R. at 22, 225, 234; 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5).  Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that John could work as a button reclaimer, cuff folder or table worker.  R. at 23.  Edwards' testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[10]  R. at 46.

---

consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[5] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[9] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).

[10] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d

**D.    Discussion**

During the period of time immediately preceding his alleged onset date of February 15, 2008, John worked as a maintenance employee for an apartment complex. R. at 29, 227. He testified that a back injury had decreased his effectiveness at work, prompting his employer to fire him. R. at 29. Throughout that same period of time, John periodically worked as a salesman and repairman for a department store. R. at 30-31, 227. He stopped working for the department store on June 8, 2008. R. at 226. When he applied for DIB and SSI benefits, John reported that he had stopped working because of severe pain in his back and right knee. R. at 226.

John apparently suffered pain in his neck and lower back throughout the summer of 2007. Dr. Kevin Wong referred John to Bradley V. Bell ("Bell"), a physical therapist affiliated with the Work Recovery Center. R. at 297-298. On August 27, 2007, John complained of burning pain in his neck and back. R. at 297. He attributed that pain to injuries that he had sustained while moving a hot water tank. R. at 297. His condition gradually improved with physical therapy. R. at 294-296. John cancelled three physical therapy appointments during the final week of September 2007. R. at 293. On October 1, 2007, he appeared for his treatment session and complained of pain in the middle part of his back. R. at 292. He cancelled two subsequent appointments. R. at 290. In a letter to Dr. Wong dated January 17, 2008, Bell stated that John had been discharged from the physical therapy program because of his repeated failure to appear for treatment. R. at 290.

In April 2008, John began to experience pain in his right knee. A magnetic resonance imaging ("MRI") scan performed on April 11, 2008, did not detect a tear in John's meniscus. R. at 363-364. X-rays of the knee taken on April 29, 2008, yielded normal results. R. at 362. John

---

203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

continued to work until June 8, 2008, even though his symptoms had not improved.  R. at 226, 345.  On August 22, 2008, Dr. Daniel L. Haffner recommended that John undergo a second MRI scan.  R. at 347.  The MRI scan, which was performed on August 25, 2008, revealed that John had suffered a torn meniscus.  R. at 350, 358-360.

Dr. Haffner surgically repaired John's knee on December 11, 2008.  R. at 365-366, 479-480.  John was instructed to attend physical therapy sessions in the aftermath of his surgery.  R. at 354.  He attended five sessions with Terry Kerestes ("Kerestes"), a physical therapist, between January 5, 2009, and February 9, 2009.  R. at 316.  Kerestes later discharged John from the program.  R. at 316.  As of February 27, 2009, John was still complaining of "nearly constant pain" in his right knee.  R. at 356.

Dr. Muna Jabbour served as John's primary care physician during the relevant period of time.  On July 14, 2009, Dr. Jabbour described John's physical abilities and limitations in a medical source statement.  R. at 435-436.  She indicated that he could frequently lift or carry objects weighing up to three pounds and occasionally lift or carry objects weighing up to ten pounds.  R. at 435.  Although Dr. Jabbour identified no limitations relating to John's pushing, pulling and sitting abilities, she asserted that he could only stand or walk for one to two hours during the course of an eight-hour workday.  R. at 435.  She further reported that John could never kneel, stoop, crouch or climb, and that he was limited to only occasional bending and balancing.  R. at 436.  In addition, Dr. Jabbour stated that John needed to avoid contact with moving machinery.  R. at 436.

Martha McMichael ("McMichael"), a non-examining medical consultant, opined on September 23, 2009, that John was physically capable of engaging in "light" work activities involving only occasional postural maneuvers.  R. at 449-455.  The next day, Dr. Arlene Rattan

reported that John's mental impairments were not "severe." R. at 456. The assessments provided by McMichael and Dr. Rattan apparently prompted the Bureau to deny John's applications for benefits. R. at 15, 55-64.

Dr. Jabbour prescribed a cane for John on November 23, 2009. R. at 497. On May 11, 2010, she completed a form declaring him to be "permanently and totally disabled." R. at 496. Dr. Jabbour stated that John was disabled because of chronic pain syndrome, a ruptured disc in his lower back, and recurrent effusion of his right knee. R. at 496.

On June 18, 2010, John underwent a sleep study at the Sleep Center of Greater Pittsburgh. R. at 550-551. The study revealed that he was suffering from severe obstructive sleep apnea syndrome. R. at 550. Dr. Amit Goulatia recommended that "urgent therapy" be initiated. R. at 550. John was encouraged to lose weight. R. at 551. A nasal continuous positive airway pressure ("CPAP") machine was prescribed for him. R. at 551. Subsequent sleep studies indicated that the provision of the CPAP machine had not yielded satisfactory results. R. at 546-549.

Dr. Jabbour provided John with a prescription for Paxil in order to alleviate his depression. R. at 274. In July 2010, John sought formal mental health treatment at Kreinbrook Psychological Services ("Kreinbrook") in Greensburg, Pennsylvania. R. at 511-527. Dr. Lindsey Groves, a psychologist affiliated with Kreinbrook, interviewed John for roughly forty-five minutes. R. at 533. On September 2, 2010, she completed assessment forms detailing John's mental limitations. R. at 529-540. Dr. Groves stated that John was 70% disabled because of his mental condition, and that he was incapable of engaging in work-related activities on a sustained basis. R. at 532. She indicated that his abilities to use judgment, deal with work stresses and function independently were anywhere from poor to nonexistent. R. at 538.

Nonetheless, Dr. Groves reported that John's abilities in other critical areas were either "fair" or "good." R. at 538-539. She recommended that he seek counseling and predicted that he would improve with treatment. R. at 531, 535.

John underwent surgery on his left shoulder on September 8, 2010. R. at 28. The operation was called to the ALJ's attention at the hearing. R. at 28. The ALJ accommodated John's shoulder impairment by precluding jobs requiring overhead pushing, pulling or reaching with the left upper extremity or constant handling or fingering with the left hand. R. at 19, 44-45. Since these limitations were conveyed to Edwards on the basis of testimonial evidence, John's counsel informed the ALJ that he did not need additional time to procure the surgical report. R. at 50.

John raises a plethora of arguments in support of his motion for summary judgment. ECF No. 9 at 3-4. He challenges findings made by the ALJ at the second, third and fifth steps of the sequential evaluation process. *Id.* at 20. John attacks the ALJ's residual functional capacity assessment on the ground that it did not accurately reflect all relevant exertional and non-exertional limitations. *Id.* at 4.

Although the record contains the assessments submitted by Dr. Jabbour, it does not contain her records of John's treatment. Challenging the weight accorded to Dr. Jabbour's assessments, John contends that the ALJ should have taken a more active role in procuring the relevant treatment records. ECF No. 9 at 17. That argument is meritless. Since John was the patient seeking treatment, as well as a finding of disability, he was in the best position to provide information about his own medical condition. *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

11

The medical source statement completed by Dr. Jabbour on July 14, 2009, detailed John's physical limitations on a function-by-function basis. R. at 435-436. The ALJ generally accounted for those limitations in his assessment of John's residual functional capacity. R. at 19. Indeed, the ALJ afforded John a sit/stand option even though Dr. Jabbour had found his sitting ability to be unlimited. R. at 19, 435. Although Dr. Jabbour indicated that John was absolutely precluded from kneeling, stooping, crouching and climbing, she apparently based that determination on the fact that he was still recovering from his knee surgery. R. at 435-436. The ALJ took note of that in his decision. R. at 22. He partially credited that portion of Dr. Jabbour's assessment by restricting John to jobs involving only occasional postural maneuvers and no climbing of ladders, ropes or scaffolds. R. at 19. The ALJ further accommodated John's physical limitations by acknowledging his need to use a cane to sit or stand.[11] R. at 19, 46. Every medical opinion must be considered in relation to the evidentiary record as a whole. *Miller v. Commissioner of Social Security*, 172 F.3d 303, 304 (3d Cir. 1999). Although Dr. Jabbour's opinion was probative of John's work-related abilities and limitations, it did not bind the ALJ in every respect. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). McMichael reported that John could engage in "light" work activities involving only occasional postural maneuvers. R. at 449-455. Her opinion was entitled to consideration as well. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). Since the ALJ included several restrictions within his residual capacity assessment that had not been identified by either Dr. Jabbour or McMichael, it is clear that neither opinion was rubber stamped. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361-362 (3d Cir. 2011).

---

[11] In his decision, the ALJ stated that John needed to use a cane "for prolonged ambulation." R. at 19. At the hearing, Edwards asked the ALJ to clarify the meaning of that phrase. R. at 46. The ALJ responded by saying that the cane would be needed to facilitate standing and walking, but not for the purpose of maintaining balance while remaining in a standing position. R. at 46.

The form completed by Dr. Jabbour on May 11, 2010, was of a different character than the medical source statement prepared on July 14, 2009. R. at 496, 435-436. On the form, Dr. Jabbour simply declared John to be "permanently and totally disabled" because of chronic pain syndrome, a ruptured disc in his lower back, and recurrent effusion of his right knee. R. at 496. The ultimate question of a claimant's disability is reserved for the Commissioner's determination. *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Under the Commissioner's regulations, conclusory opinions of "disability" do not qualify as "medical opinions" entitled to consideration. *Frank v. Barnhart*, 326 F.3d 618, 620 (5ᵗʰ Cir. 2003); *Luce v. Astrue*, 523 F.Supp.2d 922, 936 (S.D.Iowa 2007); *Earl-Buck v. Barnhart*, 414 F.Supp.2d 288, 293 (W.D.N.Y. 2006); *Wheat v. Barnhart*, 318 F.Supp.2d 358, 364, n. 11 (M.D.La. 2004); 20 C.F.R. §§ 404.1527(d), 416.927(d). A probative "medical opinion" particularly describes what a claimant can or cannot do in a typical work setting. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The existence of jobs in the national economy consistent with a claimant's residual functional capacity raises a *vocational* question rather than a *medical* question. 20 C.F.R. §§ 404.1566(e), 416.966(e). At the hearing, Edwards identified jobs that could be performed by an individual with limitations extending beyond those described in Dr. Jabbour's earlier medical source statement. R. at 44-49. Since Dr. Jabbour was not necessarily familiar with the expectations of employers in the regional and national economies, her characterization of John as a "disabled" individual was owed "little deference." *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C. 2001).

The record indicates that Imitrex was prescribed for John on June 4, 2010. R. at 587. At the hearing, John testified that he was taking Imitrex to alleviate migraine headaches. R. at 38. He complained of weekly headaches lasting for roughly a half-day at a time. R. at 39. John

further explained that he usually needed to put icepacks on his head while suffering from migraine headaches. R. at 39. He stated that his headaches were sometimes accompanied by nausea. R. at 39. In his decision, the ALJ did not list migraine headaches among John's "severe" impairments. R. at 17. This omission is the basis for John's challenge to the ALJ's step-two findings. ECF No. 9 at 12-13.

The second step of the sequential evaluation process has been described as "a *de minimis* screening device" designed to quickly "dispose of groundless claims." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 546 (3d Cir. 2003). Because the second step of the process is relatively easy for a claimant to satisfy, its invocation by the Commissioner as a basis for denying benefits is "certain to raise a judicial eyebrow" in all but the most frivolous cases. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 361 (3d Cir. 2004). In this case, however, John's claims were not denied at the second step. Since five "severe" impairments were found, his case proceeded through the third, fourth and fifth steps of the analysis. R. at 17-23. For this reason, the ALJ's failure to recognize migraine headaches as one of John's "severe" impairments was itself inconsequential. *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987). Under the Commissioner's regulations, any functional limitations resulting from a claimant's "non-severe" impairments must be reflected in the assessment of his or her residual functional capacity. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Therefore, the more appropriate question is whether the ALJ improperly discounted or overlooked a functional limitation attributable to John's migraine headaches in determining his work-related abilities and limitations. The same question must be answered in relation to each of John's impairments.

The Commissioner must give serious consideration to a claimant's subjective complaints whenever the record contains objective evidence of a medically determinable impairment that

could reasonably be expected to cause the symptoms described in the claimant's testimony. *Mason v. Shalala*, 994 F.2d 1058, 1067-1068 (3d Cir. 1993). The documentary record indicates that John suffers from a prostate impairment. R. at 533. At the hearing, John testified that he typically needed to urinate every fifteen to thirty minutes. R. at 40-41. He stated that one of his physicians had speculated that his urinary frequency was attributable to a lower back injury. R. at 41. When asked whether urinary frequency would preclude the performance of substantial gainful activity, Edwards testified that the duration of an individual's time in the restroom would determine the answer to that question. R. at 48-49. In his decision, the ALJ did not discuss the extent to which John's urinary problems would affect his ability to work. R. at 15-24. The decision also contains no discussion of John's migraine headaches. R. at 15-24.

A claimant attempting to establish the existence of a statutory "disability" must demonstrate that both his or her medically determinable impairment (or combination of impairments) and his or her inability to work have lasted (or can be expected to last) for the statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Unrelated impairments independently lasting for shorter periods of time cannot be combined to satisfy the Act's durational requirement. 20 C.F.R. §§ 404.1522(a), 416.922(a). The Commissioner asserts that the record contains no evidence of migraine headaches persisting long enough to impact the residual functional capacity analysis. ECF No. 11 at 17-18. Nevertheless, it is undisputed that Imitrex was prescribed for John on June 4, 2010. R. at 587. Four months later, John testified that he was still experiencing migraine headaches. R. at 38-39. Where a claimant's impairments "can be expected to last" for a full year, the Commissioner need not wait for the twelve-month period to expire before awarding benefits. *Walton*, 535 U.S. at 224. Moreover, the ALJ never rejected the limitations allegedly resulting

15

from John's migraine headaches and urinary frequency on the ground that they were not expected to last for twelve months. He simply made no mention of them. R. at 15-24. Under these circumstances, it is impossible to determine whether "significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Since Edwards acknowledged that absences from the workplace or work station due to migraine headaches or urinary frequency could potentially compromise one's ability to maintain a full-time job, the testimonial evidence relating to those impairments was clearly pertinent to John's case. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-204 (3d Cir. 2008)(explaining that the Commissioner "may not reject pertinent or probative evidence without explanation").

The ALJ dismissed Dr. Groves' assessment on the ground that it had been based solely on a single examination. R. at 22. The only portion of that assessment discussed by the ALJ was the assertion that John was 70% disabled because of mental impairments. R. at 22, 532. The ALJ did not address the portion of Dr. Groves' assessment suggesting that John could not exercise judgment, deal with work stresses or function independently.[12] R. at 538. Edwards testified that no jobs existed in the national economy for an individual who had no ability to tolerate work-related stresses or function on an independent basis. R. at 49. Admittedly, the ALJ was not required to accept every limitation alleged by John. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). At a minimum, however, the ALJ had an obligation to provide reasons for disregarding the functional limitations described by Dr. Groves. *Reefer v. Barnhart*, 326 F.3d 376, 381-382 (3d Cir. 2003). Since those proposed limitations elicited testimony

---

[12] Although Dr. Groves predicted that John would miss more than three days of work per month if he were to be gainfully employed, she attributed those anticipated absences to his physical condition. R. at 535. Since Dr. Groves was not a physician with the expertise to ascertain the potentially disabling effects of John's physical impairments, that portion of her report was not sufficiently probative to warrant discussion in the ALJ's decision. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008).

potentially supporting a finding of disability, they should not have been disregarded without discussion. *Johnson*, 529 F.3d at 203-205.

Dr. Groves indicated that John's mental impairments had resulted in functional limitations of sufficient severity to satisfy the "B" criteria of Listings 12.04 and 12.06. R. at 536. In his closing argument, John's counsel argued that John was *per se* disabled under those Listings. R. at 50. Dr. Groves' opinion was specifically relied upon as a basis for that argument. R. at 50. The ALJ was not bound by Dr. Groves' opinion regarding the issue of medical equivalence. *Valder v. Barnhart*, 410 F.Supp.2d 134, 140 (W.D.N.Y. 2006). In his decision, however, the ALJ never explained his reasons for rejecting that opinion. R. at 17-18. Since the issue of *per se* disability was specifically pressed at the hearing, the ALJ should have addressed Dr. Groves' assessment directly. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 504-505 (3d Cir. 2009). The ALJ's findings concerning the "B" criteria exceeded those previously identified by Dr. Rattan. R. at 18, 22, 266. That should not come as a surprise, since Dr. Rattan never examined John and reviewed his treatment records before he had sought formal mental health treatment. R. at 468. The evidentiary basis for the ALJ's conclusions relating to the alleged mental limitations is simply not apparent from his decision.

Since dispositive factual findings have been left unexplained, the Commissioner's decision denying John's applications for benefits cannot stand. *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 121-123 (3d Cir. 2000). The remaining question is whether an immediate award of benefits is warranted, or whether the proper remedy is a remand for further administrative proceedings. A judicially-ordered award of benefits is justified only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v.*

*Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010).  That standard is not satisfied in this case.  As discussed earlier, Edwards testified that the limitations identified by Dr. Jabbour would not preclude the performance of substantial gainful activity.  R. at 45-49.  Despite her assertion that John could not work, Dr. Groves indicated that he had the ability to engage in several basic work-related activities.  R. at 538-539.  John's physical and mental abilities were never assessed by consultative examiners.  20 C.F.R. §§ 404.1519, 416.919.  The unanswered questions about John's medical condition counsel in favor of a remand for further consideration of his claims and against an order awarding benefits.  *Diaz*, 577 F.3d at 506 (finding a remand to be appropriate where the reviewing court could not "ascertain whether the ALJ [had] truly considered competing evidence, and whether a claimant's conditions, individually and collectively, impacted her workplace performance").

John maintains that the ALJ erred in failing to consider the effects of his sleep apnea under Listing 3.10.  ECF No. 9 at 18.  The documentary record suggests that John's sleep apnea did not respond to treatment.  R. at 546-549.  Since a remand is required for other reasons, the Court has no occasion to consider whether the ALJ's failure to consider the applicability of Listing 3.10 would otherwise provide an independent basis for setting aside his decision.  *Reefer*, 326 F.3d at 381.  It suffices to say that the matter should be given appropriate consideration on remand.  A remand will also provide John with an opportunity to procure additional documentary evidence pertaining to his condition, including the report of the operation performed on his left shoulder.  R. at 28, 50.

### E.    Conclusion

It is respectfully recommended that the motion for summary judgment filed by the Commissioner (*ECF No. 10*) be denied, and that the motion for summary judgment filed by John

(*ECF No. 8*) be denied to the extent that it requests an award of benefits but granted to the extent that it seeks a vacation of the Commissioner's decision, and a remand for further administrative proceedings. It is also recommended that the Commissioner's decision be vacated, and that the case be remanded for further consideration of John's applications for DIB and SSI benefits. In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days to file written objections to this report and recommendation. A party's failure to file written objections will seriously impair his or her ability to challenge this Court's legal conclusions on appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011).

Dated: June 13, 2013

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc:     All counsel of record